KNOLL, Justice.
 
 *
 

 ^JjThis case involves the res
 
 nova
 
 question in this Court of whether the unpaid claims of the Louisiana Safety Association of Timbermen Self-Insurers Fund (“Fund”) arising from the insolvency of Reliance Indemnity Company (“Reliance”) are covered claims under La.Rev.Stat. § 22:1375-1394,
 
 [1]
 
 the Louisiana Insurance Guaranty Association law (“LIGA”). Finding the Fund was an insurer for purposes of LIGA coverage and that Reliance was the Fund’s reinsurer, not an excess insurer, we reverse the lower courts’ determinations that the Fund’s unpaid Reliance claims were covered claims under LIGA.
 

 FACTS AND PROCEDURE
 

 On February 7, 1941, the Red River Timber Marketing Association was formed under the Louisiana Cooperative Marketing Act. Thereafter, on October 2, 1991, the association changed its name to the Louisiana Safety Association of Timber-
 
 *352
 
 men (LSAT). Contemporaneously with its name change, the articles were amended to provide that members of the association could be admitted if they paid a membership 12fee, signed a membership agreement, and met other uniform conditions detailed in the bylaws. The association articles were further amended to state LSAT was a nonprofit corporation and to recognize the membership rights were not transferable by assignment, sale, or inheritance.
 

 Subsequently, on October 7, 1991, LSAT’s members established the Louisiana Safety Association of Timbermen Self-Insurers Fund. The Fund was formed pursuant to the provisions of La.Rev.Stat. §§ 23:1195-1200.5 to allow its members to participate in a trustee-administered fund for the purpose of satisfying each member’s workers’ compensation obligations. The members then executed an indemnity agreement which had a twofold purpose: (1) to set up a method for the appointment of certain persons as the board of trustees; and (2) to provide that each member agreed to be held liable jointly and
 
 in solido
 
 for any award, to promptly pay membership premiums, and to pay all assessments lawfully levied.
 

 LSAT’s application with the Louisiana Commissioner of Insurance for recognition as a worker’s compensation group self-insurance fund was granted. Pertinent to the present litigation, LSAT obtained the “excess insurance” as required by La.Rev. Stat. § 23:1196(A)(5)(1999) from Reliance for the 1998 policy year.
 
 [2]
 
 On | «October 3, 2001, the Commonwealth Court of Pennsylvania placed Reliance into liquidation. The Fund then provided LIGA with proof of its claims against Reliance. On February 4, 2004, LIGA denied the Fund’s claims, reasoning the Fund’s policy with Reliance was one of reinsurance through which the Fund was an insurer who sought to limit its risk and was not a “covered claim” as defined in La.Rev.Stat. § 22:1379.
 

 Subsequently, the Fund sued LIGA, seeking declaratory relief for continuing coverage for all past and future losses in
 
 *353
 
 accordance with the terms of the Reliance policy. LIGA filed responsive pleadings, asserting its coverage only extends to direct insurance, not reinsurance, and that the Fund is an insurer whose claims it does not cover; alternatively, LIGA contended other insurance must be exhausted before LIGA coverage is reached, and the combined net worth of the Fund’s members exceeded |4$25 million during the year prior to Reliance’s insolvency thereby precluding coverage as provided in La.Rev. Stat. § 22:1379(3)(f).
 

 Thereafter, the Fund moved for partial summary judgment, seeking a declaration that the Reliance policy was direct excess insurance, that its claims are “covered claims,” that the Fund did not have other insurance covering the claims, and that the net worth of its members was immaterial to a determination of whether the claims are covered by LIGA.
 

 LIGA filed a cross-motion for summary judgment, asserting the Fund’s claims are not covered because the Fund is an insurer and the 1999 amendments to the definition of a “covered claim” under the Insurance Guaranty Association Law bar the claims of a self-insurer. Additionally, LIGA moved to compel discovery of financial information about the net worth of the Fund’s members.
 

 After conducting a contradictory hearing, the trial court granted the Fund’s motion for summary judgment, finding the Fund’s claims met the statutory definition of a “covered claim” and that the Fund did not provide insurance. In addition, the trial court denied LIGA’s motion to compel discovery, finding the Fund’s members are not affiliates of the Fund as provided in La.Rev.Stat. § 22:1379(3)(f). LIGA then timely appealed the trial court’s judgment.
 

 Noting this was a case of first impression, the appellate court affirmed the trial court judgment, holding the Fund was not an “insurer” for purposes of LIGA that excluded any insurer from LIGA coverage, that the Fund’s claims were not excluded from LIGA coverage under provisions that excluded claims within coverage provided by a self-insurer, and that the Fund members were not “affiliates” for LIGA purposes of excluding from coverage claims asserted by an insured whose net worth, including affiliates, exceeded $25 million.
 
 Louisiana Safety Association of Timber-men Self-ffnsurerSf, Fund v. Louisiana Insurance Guaranty Association,
 
 43,615 (La.App. 2 Cir. 12/3/08), 998 So.2d 817. We granted LIGA’s writ application to consider the correctness
 
 vel non
 
 of the appellate court’s disposition of this
 
 res nova
 
 issue.
 
 Louisiana Safety Association of Timbermen Self-Insurers Fund v. Louisiana Insurance Guaranty Association,
 
 09-C-0023 (La.3/6/09), 3 So.3d 493.
 

 SUMMARY JUDGMENT LAW
 

 Summary judgments are reviewed
 
 de novo
 
 on appeal, with the reviewing court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate; whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law.
 
 Power Marketing Direct, Inc. v. Foster,
 
 05-2023 (La.9/6/06), 938 So.2d 662, 669;
 
 Smith v. Our Lady of the Lake Hosp., Inc.,
 
 93-2512 (La.7/5/94), 639 So.2d 730, 750.
 

 A motion for summary judgment will be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La.Code Civ. Proc. art. 966(B). This article was amended in 1996 to provide that “summary judgment procedure is designed to secure the just, speedy, and inexpensive determi
 
 *354
 
 nation of every action ... The procedure is favored and shall be construed to accomplish these ends.” La.Code Civ. Proc. art. 966(A)(2).
 

 In 1997, the Legislature enacted La.Code Civ. Proc. art. 966(C)(2), which further clarified the burden of proof in summary judgment proceedings, providing:
 

 The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements |fiessential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
 

 This amendment, which closely parallels the language of
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), first places the burden of producing evidence at the hearing on the motion for summaiy judgment on the mover (normally the defendant), who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent’s case. At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial. See Maraist and Lemmon, Louisiana Civil Law Treatise: Civil Procedure, § 6.8 (1999). Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion.
 
 Babin v. Winn-Dixie Louisiana, Inc.,
 
 00-0078 (La.6/30/00), 764 So.2d 37, 39-40;
 
 Hayes v. Autin,
 
 96-287 (La.App. 3 Cir. 12/26/96), 685 So.2d 691,
 
 writ denied,
 
 97-0281 (La.3/14/97), 690 So.2d 41.
 

 DISCUSSION
 

 LIGA contends the lower courts erred in holding the Fund was not engaged in the business of insurance and that Reliance’s coverage of the Fund was excess insurance covered by LIGA. Rather, LIGA submits that although the Legislature restrictively exempted workers’ compensation self-insurance funds from the regulatory provisions of Chapter 1 of the Insurance Code, the Fund nonetheless must be considered an “insurer” or “self-insurer” for other purposes because that is what the Fund does — it pooled its workers’ compensation liabilities and then ceded the upper portion of that liability to Reliance in exchange for a premium. Thus, it argues |7this constitutes a classic example of reinsurance
 
 [3]
 
 for which LIGA does not provide coverage.
 

 
 *355
 
 The Fund, tracking the holdings of the appellate court, contends its unpaid claims with Reliance, now insolvent, constitute “covered claims” as defined in La.Rev.Stat. § 22:1379(3)(a) under LIGA, that under the provisions of La.Rev.Stat. § 23:1195(A)(1),
 
 see infra,
 
 self-insurance is not insurance for purposes of workers’ compensation, and that the net worth of the Fund members is immaterial.
 

 As a prefatory matter, it bears recalling that LIGA applies to “all kinds of direct insurance” except for those La.Rev.Stat. § 22:1377 excludes. To determine whether the guaranty coverage is applicable to a particular policy, we are directed to guide our decision by the coverage specified and established in the policy provisions rather than to the name, label or marketing designation of the policy. La.Rev.Stat. § 22:1377(B). Finally, La.Rev.Stat. § 22:1379(3)(a) defines a covered claim for LIGA purposes as “an unpaid claim ... which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Part applies issued by an insurer, if such insurer becomes an insolvent insurer after September 1,1970.”
 

 |8LIGA’s first argument is that the Fund is an insurer whose claims it does not cover. Key to that argument is La. Rev.Stat. § 22:1379(3)(b) which provides limitations for LIGA’s liability for insolvent insurance companies. It provides, in pertinent part:
 

 (b) “Covered claim” shall not include any amount due any reinsurer, insurer, health maintenance organization or plan, preferred provider organization or plan, employee retirement fund including but not limited to plans subject to the Employee Retirement Income Security Act of 1974, Medicare, Medicaid, any insurance pool,[
 
 4
 
 ] or any underwriting association, or -within the coverage represented, replaced, or both by a certificate of self-insurance as subrogation recoveries or otherwise.
 

 From the outset, LIGA contends the Fund’s claims against it are disallowed because the Fund is an insurer as provided in La.Rev.Stat. § 22:1379(3)(b) and, at least for LIGA purposes, it was as an insurer that the Fund obtained a policy of reinsurance from Reliance. To the contrary, the Fund admits it is a workers’ compensation group self-insurance entity, but contends the appellate court did not err when it determined the Legislature specified in La.Rev.Stat. § 23:1195(A)(1) that this funding arrangement for purposes of workers’ compensation is not insurance. Thus, our first task is to ascertain the meaning of La.Rev.Stat. § 23:1195(A)(1).
 

 Turning to general rules of statutory construction, courts should remember the following axioms. Legislation is the solemn expression of the legislative will; thus, the interpretation of legislation is
 
 *356
 
 primarily the search for the legislative intent.
 
 Cat’s Meow, Inc. v. City of New Orleans Through Dept. of Finance,
 
 98-0601 (La.10/20/98), 720 So.2d 1186, 1198;
 
 Hutchinson v. Patel,
 
 93-2156 (La.5/23/94); 637 So.2d 415. When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. Civ.Code art. 9;
 
 Cat’s Meow,
 
 720 So.2d at 1198. The starting point for interpretation of any statute is the language of the statute itself.
 
 Touchard v. Williams,
 
 617 So.2d 885 (La.1993).
 

 La.Rev.Stat. § 23:1195(A)(1) provides:
 

 (1) Any five or more Louisiana employers who are not public entities, each of whom has a positive net worth, is financially solvent, and is capable of assuming the obligations set forth under this Chapter, and who are all members of the same bona fide trade or professional association may agree to pool their liabilities to their employees on account of personal injury and occupational disease arising out of or incurred during the course and scope of the employment relationship.
 
 I’his arrangement shall not be deemed to be insurance and shall not be subject to the provisions of Chapter 1 of Title 22 of the Louisiana Revised Statutes of 1950.
 
 (Emphasis added).
 

 Examining that statutory language, the appellate court stated “[t]he logical conclusion arising from the pronouncement that the arrangement shall not be deemed insurance is that a self-insurer fund ... is not an insurer ... and is not an insurer whose claims are excluded from LIGA coverage .... ”
 
 Louisiana Safety Association of Timbermen-Self Insurers Fund,
 
 998 So.2d at 822. After carefully examining the language of La.Rev.Stat. § 23:1195(A)(1) and related statutes, we determine otherwise.
 

 It is presumed every word, sentence or provision in the statute was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used.
 
 Sultana Corp. v. Jewelers Mut. Ins. Co.,
 
 03-0360 (La.12/3/03), 860 So.2d 1112. It is presumed the Legislature understands the effect and meaning of the words it uses in a statute.
 
 Spragio v. Board of Trustees,
 
 468 So.2d 1323 (La.App. 1 Cir.).
 
 writ denied,
 
 472 So.2d 32 (La.1985). | 1ftThe Legislature is presumed to have enacted each statute with deliberation and with full knowledge of all existing laws on the same subject.
 
 Theriot v. Midland Risk Ins. Co.,
 
 694 So.2d 184 (La.1997).
 

 Had the Legislature simply stated, “This arrangement shall not be deemed to be insurance,” we might agree with the lower courts’ holding that the Fund was not an insurer. However, as quoted above La. Rev.Stat. § 23:1195(A)(1) further states the arrangement “shall not be subject to the provisions of Chapter 1 of Title 22 of the Louisiana Revised Statutes of 1950.” Aware that every word, sentence or provision in the statute was intended to serve some useful purpose, we find it necessary to delve farther to ascertain the full import of La. Rev. Stat § 23:1195(A)(1).
 

 An examination of the Insurance Code shows it is divided into eight chapters. As applicable to our analysis, Chapter 3 addresses self-insurers. There, La.Rev.Stat. § 22:3001(A) provides: “This Chapter shall be applicable to and shall regulate self-insurers and self-insurance plans, as defined in this Chapter,
 
 rvhich are subject to the jurisdiction of the commissioner of insurance under Chapter 1 of this Title. This Chapter shall not be applicable to any worker’s compensation plan,
 
 ...”
 
 *357
 
 (Emphasis added). The inclusion of this language in La.Rev.Stat. § 22:3001(A) indicates the Legislature contemplated that there are self-insurers who are subject to the provisions of Chapter 1 of the Insurance Code and demonstrates that the Legislature emphasized in La.Rev.Stat. § 23:1195(A)(1) the fact that workers’ compensation self-insurers are differentiated from other self-insurers, particularly by exclusion from the provisions of Chapter 1 of the Insurance Code.
 

 When we read La.Rev.Stat. § 23:1195(A)(1) in
 
 pari materiae
 
 with La. Rev.Stat. § 22:3001(A), it is evident the Legislature sought
 
 only
 
 to exclude workers’ compensation self-insurers from the regulatory provisions of Chapter 1 of Title 22 of In the Insurance Code when it adopted the language of La.Rev.Stat. § 23:1195(A)(1). Thus, its designation in La.Rev.Stat. § 23:1195(A)(1) that self-insurance is not deemed insurance has a circumscribed and limited meaning, not the broad pronouncement the Fund urges. Having so concluded, we must further examine the Fund’s formative documents and its contract with Reliance to determine the true character of the legal relationship between these entities.
 

 Louisiana’s Insurance Guaranty Association Law does not define the term “insurer.” Notwithstanding, the Louisiana Insurance Code provides a general definition for the term “insurer”:
 

 [Ejvery person engaged in the business of making contracts of insurance, other than a fraternal benefit society. A reciprocal, an inter-insurance exchange, insurance exchange syndicate, or a Lloyds organization is an “insurer”. Any person who provides an employee benefit trust as specified in Subpara-graph (9)(a) of this Section is an insurer. A health maintenance organization is an insurer but only for the purposes enumerated in R.S. 22:242(7).
 

 La.Rev.Stat. § 22:5(10).
 

 Also, as defined in the Louisiana Insurance Code, insurance is “a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies.” La.Rev.Stat. § 22:5(9)(a). Moreover, the Insurance Guaranty Association Law defines an “insurance policy” as “an insurance contract as defined in R.S.22:624.”
 
 [5]
 
 .
 

 As the court of appeal noted, self-insurance is one of the means of securing workers’ compensation to employees as provided in La.Rev.Stat. § 23:1168. It was this vehicle LSAT chose to meet its members’ workers’ compensation obligations | !2when it established the Fund. In conjunction with the formation of the Fund, LSAT’s members executed an indemnity agreement which specified each member agreed to be held liable jointly and in solido for any workers’ compensation award, to promptly pay membership premiums, and to pay all assessments the Fund lawfully levied.
 
 [6]
 
 Utilizing the defini
 
 *358
 
 tions referenced above, it is clear, at least for purposes of LIGA, the Fund was an insurer
 
 [7]
 
 — the Fund undertook to indemnify its members for the full amount of workers’ compensation claims allowed under the Louisiana Workers’ Compensation Act and the members agreed to pay premiums and assessments to the Fund for that purpose.
 
 [8]
 
 In reaching the conclusion the Fund was an insurer, we find | )3our determination buttressed by the characterization the Fund and Reliance ascribed to their contractual relationship.
 
 [9]
 

 Although it cannot be denied that at the time of the formation of the Fund, La.Rev.Stat. § 23:1196(A)(5) required the Fund to “[m]aintain ... a contract or contracts of specific excess insurance ...,” an examination of the documents shows LSAT and Fund loosely substituted the term “reinsurance” for “excess” insurance throughout.
 
 Compare
 
 the Fund Trust Agreement § 1, IV(j) (stating the Board of Trustees shall “obtain or approve excess insurance coverage to protect The Fund against excess losses”); the Members’ Indemnity Agreement ¶ (6) (stating that “[t]he Trustees shall secure excess insurance to protect said members against excess losses”); to Fund Trust Agreement § 2 (stating that the primary purpose of the member’s premium deposit was “to utilize the deposit for ... partial funding of statutory reinsurance”); the Members’ Indemnity Agreement ¶ (9)(f) (stating that the Trustees are authorized to set aside members’ premiums for the “[pjayment of premiums for reinsurance and/or excess insurance as required by law”).
 

 At this juncture, we would likewise be remiss if we failed to observe that the insurance contract between the Fund and Reliance is titled, “Workers Compensation Excess of Loss Reinsurance Agreement.” Indeed, the contract between the Fund and Reliance time and again referred to the Fund as the “reinsured” and Reliance as the “reinsurer.” Cognizant of this denomination, but heeding the language of La.Rev.Stat. § 22:1377(B) to examine “the coverage specified and established in the policy provisions rather than to the name, label or marketing designation of the poli
 
 *359
 
 cy,” we 114turn our attention to an examination of the nature of a reinsurance contract and excess insurance to properly characterize the insurance relationship between the Fund and Reliance.
 

 Reinsurance is a contract whereby one insurer transfers or cedes to another insurer all or part of the risk it has assumed under a separate or distinct policy or group of policies in exchange for a portion of the premium.
 
 Fontenot v. Marquette Cas. Co.,
 
 258 La. 671, 247 So.2d 572, 575 (1971). There are two parties to a reinsurance agreement. The insurance company which is transferring or ceding its risk is known as the reinsured, the cedent, the original insurer, or the direct insurer. The insurance company to which the risk is transferred is known as the reinsurer. Couch on Insurance, 1 A, § 9:2 (3d ed.). “Reinsurances, while they may be of the entire risk, are ordinarily of such portion of the amount the insurer deems proper to reinsure.”
 
 Chalaron v. Ins. Co. of N. Am.,
 
 48 La. Ann. 1582, 21 So. 267 (1896). Among other reasons, reinsurance increases an insurer’s capacity to accept new risks, enables it to reduce required reserves, and allows it to write risks that might otherwise be beyond its capacity. See
 
 Fontenot,
 
 247 So.2d at 575:
 
 Donaldson v. United Community Ins. Co.,
 
 98-1187 (La.App. 3 Cir. 2/10/99), 741 So.2d 676, 679,
 
 writ denied,
 
 99-727 (La.5/2/99), 740 So.2d 1285.
 

 On the other hand, an
 
 insured
 
 purchases excess insurance to provide
 
 supplemental coverage that picks up where his primary coverage ends
 
 and thus provide protection against catastrophic losses.
 
 Louisiana Ins. Guar. Ass’n v. Interstate Fire & Cas. Co.,
 
 93-0911 (La.1/14/94), 630 So.2d 759, 773. An excess insurer has been defined as an insurer whose coverage of a given loss is activated only after the magnitude of the loss exceeds the limits of applicable “primary” insurance.
 
 Louisiana Ins. Guar. Ass’n,
 
 630 So.2d at 773
 
 (iciting
 
 16 G. Couch, R. | l5Anderson and M. Rhodes, Couch on Insurance § 62.48 (2d ed.1983) (defining); 8A J. Appleman and J. Appleman, Insurance Law and Practice § 4909.85, p. 452 (1981) (excess policies “are policies of insurance sold at comparatively modest cost to pick up where primary coverages end, in order to provide extended protection”)). Stated another way, excess insurance provides a second layer of coverage that is most often triggered on the exhaustion of the limits of the primary policy. 23 Holmes’ Appleman on Insurance § 145.1, p. 4 (2d ed.).
 

 Applying these principles, it is clear the contractual relationship between the Fund and Reliance presents a classic instance of reinsurance, not excess insurance, where the Fund functions as a reinsurer. Notably, it is not the Fund’s insolvency that implicates LIGA’s potential liability. The Fund is liable, or at risk, for the
 
 full amount
 
 of any workers’ compensation claim allowed under the Workers’ Compensation Act. In order to reduce its exposure as an
 
 insurer,
 
 it bought a policy of reinsurance that limited its exposure on any claim in excess of $200,000. This is the classic function of a reinsurance policy.
 

 In contrast, an excess policy provides additional coverage to an insured on their property or business, or to cover a potential property damage or liability claim. The excess policy does not insure another party, but rather, the excess policy only comes into play if the damages to the covered property or a judgment for damages, exceeds the coverage of the primary policy. Notably, an excess policy assumes the existence of
 
 an underlying policy.
 
 In this present matter, there is no underlying policy because the Fund does not issue policies; it issues certificates of membership. If the claims paid exceed the income
 
 *360
 
 from membership dues, the shortfall is covered by assessment to its members, not by liquidation of the Fund.
 

 | ^Moreover, the Fund pays no dues to LIGA. The Fund’s payments to the injured employee are not covered by LIGA; this is undisputed. In contrast, LIGA pays the claims of policyholders of failed insurance companies. While we recognize it was a good business practice for the Fund to buy reinsurance to cover part of its risk, nevertheless this does not make LIGA liable for reimbursement of claims covered by the reinsurance, as this would effectively make LIGA liable for claims that are exempt from LIGA’s responsibility. The Fund bears the risk that its reinsurance has become valueless; this is not LIGA’s responsibility. LIGA is not liable to cover the insolvency of a reinsurer. Therefore, under the provisions of La.Rev.Stat. § 22:1379(3)(b) the Fund’s unpaid claims arising from Reliance’s insolvency were rooted in a policy of reinsurance and are not “covered claims” for which LIGA is responsible.
 

 DECREE
 

 For the foregoing reasons, the judgments of the lower courts are reversed and set aside. Summary judgment is granted in favor of the Louisiana Insurance Guar- - anty Association and against the Louisiana Safety Association of Timbermen-Self Insurers Fund, dismissing the Fund’s claims against LIGA with prejudice. Costs of this litigation are assessed to the Louisiana Safety Association of Timbermen Self-Insurers Fund.
 

 REVERSED AND RENDERED.
 

 *
 

 Retired Judge Philip C. Ciaccio, assigned as Justice
 
 ad hoc,
 
 sitting for Justice Chet D. Traylor, now retired.
 

 [1]
 

 . In 2008, the Louisiana Legislature renumbered all of the statutes in the Louisiana Insurance Code. We have cited to the current sections of the Insurance Code.
 

 [2]
 

 . La.Rev.Stat. § 23:1196(A)(5) (1999) provides, in pertinent part:
 

 A. Each fund established pursuant to R.S. 23:1195 shall:
 

 (5) Maintain at all times, on a fund-year basis, a contract or contracts of specific
 
 excess insurance
 
 of not less than two million dollars per occurrence and aggregate
 
 excess insurance
 
 of not less than two million dollars. The maximum retention under the
 
 excess insurance
 
 contracts shall not exceed amounts as may be provided by the department by regulation. (Emphasis added).
 

 The Fund's insurance contract was denominated as reinsurance, not excess insurance. The characterization of the Fund as an insurer and its contractual relationship with Reliance are central to the resolution of this litigation.
 

 Subsequent to the initiation of this litigation, the Legislature amended this portion of the statute twice. It inserted three times the words "or reinsurance” at each place where "excess insurance” appeared. The Legislature also added the following language:
 

 Solely for the purposes of authorizing the purchase of reinsurance pennitted under this Subsection, each fund shall be deemed an insurer.
 
 Such
 
 excess insurance or reinsurance
 
 shall only be purchased from companies having a minimum rating of Aby A.M. Best Company, A — by Fitch Ratings, A — by Weiss Ratings, Aby Standard & Poor's, or A3 by Moody's Investors Services, or better, and such
 
 reinsurance
 
 may be purchased from admitted or nonadmitted companies, provided that the provisions of R.S. 22:651 through 661, and Financial Accounting Standard Number 113 as promulgated and updated by the Financial Accounting Standards Board, shall apply to all such
 
 reinsurance. All excess insurance policies or reinsurance agreements must be approved by the department prior to use. (Emphasis
 
 added).
 

 2006 La. Acts, No. 387; 2007 La. Acts, No. 384.
 

 [3]
 

 . We note the appellate court erred when it expressed in a footnote that the characterization of the policy between the Fund and Reliance as being reinsurance or providing direct excess insurance was not before it. To the contrary, we find the issue of whether the Fund was an insurer not only essential to our resolution of the issues before us, but also find that the characterization of the Reliance policy's illumines our determination of whether the Fund was an insurer. An examination of LIGA’s brief to the appellate court shows that although it focused its argument on the definition of "covered claim,” it also referenced jurisprudence from other states that involved the questions of whether the self-insured was an insurer and whether reinsurance policies were implicated. We further note that in its writ application to this Court LIGA contends the Fund was an insurer who
 
 *355
 
 entered into a reinsurance contract with Reliance. Thus, we find the question of reinsurance is properly before us.
 

 [4]
 

 . In the present case we are not presented with an insurance pool. Rather than a pooling of insurance, we have a trade or professional association that has agreed to pool their liabilities to their employees on account of personal injury and occupational disease arising out of or incurred during the course and scope of the employment relationship.
 
 See
 
 La.Rev.Stat. § 23:1195(A)(1),
 
 infra.
 
 The Fund is the vehicle created to address those pooled liabilities. As specifically provided in La.Rev.Stat. § 23:1195(A)(3), the Fund itself is not an insured member of LIGA and LIGA is not liable “under any circumstances for any claims, or increments of any claims, made against the arrangement.” In the present case, it is not the Fund’s insolvency that implicates LIGA's potential liability.
 

 [5]
 

 . La.Rev.Stat. § 22:624 provides that an insurance contract is a written instrument that sets forth: (1) the names of the parties to the contract; (2) the subject of the insurance; (3) the risks insured against; (4) the time at which the insurance takes effect and the period during which the insurance continues: (5) a statement of the premium; and (6) the conditions pertaining to the insurance.
 

 [6]
 

 . The indemnity agreement provides, in pertinent part:
 

 1. The members of this Fund do jointly and in
 
 solido
 
 covenant and agree that they will pay any award as would otherwise be a claim under the laws of the State of Louisiana; and the Fund and each member agrees to pay any assessments lawfully levied by the courts of the State of Louisiana.
 

 
 *358
 
 8. (c) The members shall make prompt payment of all premiums and assessments as required by the Trustees.
 

 [7]
 

 . The primary characteristic of the business of insurance is the transferring or spreading of risk.
 
 Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau,
 
 701 F.2d 1276, 1285 (9th Cir.1983). So long as this characteristic is present, the business of insurance is not limited to traditionally recognized areas of insurance.
 
 Id.
 

 [8]
 

 . In reaching that determination, we find our earlier decision in
 
 Bowens v. General Motors Corp.,
 
 608 So.2d 999 (La.1992), distinguishable. In
 
 Bowens,
 
 we held that a single self-insured statutory employer was not an “insurer” within the meaning of LIGA’s non-duplication of recovery provision, La.Rev.Stat. § 22:1386. Although we observed that self-insurance is not the equivalent of an insurance policy, we qualified that holding by stating,
 

 In the absence of an express legislative pronouncement to the contrary, we hold dial the presence of a self-insurer does not preclude liability on the part of LIGA to plaintiff for compensation benefits.
 

 Bowens,
 
 608 So.2d at 1004. Thereafter, in 1999 the Legislature provided an express pronouncement, amending La.Rev.Stat. § 22:1386 to include among the policies that must be exhausted before LIGA's coverage is reached, coverage under self-insurance certificates.
 

 [9]
 

 . This characterization conforms with the manner in which the Fund viewed itself. In a note to the Fund’s audited financial statements for the years ended December 31, 1999 and 2000, it is stated that the Fund provide workers’ compensation insurance and that the Fund is treated for federal income tax purposes as a mutual insurance company.